UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

SIDNEY DURELL HILL,

          Plaintiff,

v.

BRENDA L. BUCHANAN et al.,

          Defendants.
_____/

Case No. 2:19-cv-48

Honorable Janet T. Neff

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez,* 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Brian Hall, Belanger, McKee, Moran, Forrester, Jon Hall, Horton, Corrigan, Blemke, Bigger, Burke, and Stranaly.

**Discussion**

I. Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Michigan, where the events giving rise to his complaint occurred. Plaintiff sues MDOC Deputy Director Kenneth McKee and the following MDOC employees at URF: Warden Connie Horton; Assistant Deputy Warden J. Corrigan; Correctional Officers John Burke, Crystal Bigger, Brian Hall, and Unknown Belanger; Sergeant Unknown Blemke; Warehouse Manager Terry Moran; Business Manager Edson Forrester; and Quartermaster Jon Hall. He also sues the following employees of Corizon Health Inc., which provides healthcare to prisoners through a contract with the MDOC: Registered Nurses Brenda L. Buchanan, Ressie A. Stranaly, Robyn L. Waybrant, Mary A. Guild, Amber C. Payment, Maria Bennett, and Tonya L. Winberg.

Plaintiff alleges that he worked as a custodian cart puller at URF, requiring him to pull carts from one building of the prison facility to another. On the morning of February 2, 2018, as he was on his way to his work assignment, he nearly slipped and fell on a snow-covered walkway. When he arrived at his work assignment, he reported to Officer Brian Hall that the outdoor walkways used by prison staff were shoveled, but the walkways to the housing units were not shoveled. He told Hall, "I almost slipped and fell on my way here." (Compl., ECF No. 1, PageID.9.) Hall responded, "I think a strong young boy like you will make it okay." (*Id.*) Plaintiff was wearing his state-issued "Oxford" shoes at the time, and he asked Hall if he could go back to his housing unit to get his work boots. Hall denied his request, telling him, "No, your state shoes will work okay." (*Id.*)

Plaintiff notes that the failure of prison staff to clear snow from the walkways in a timely manner was brought to the attention of the URF Warden's Forum at a meeting in January 2017. (1/25/2017 Warden's Forum Minutes, ECF No. 1-2, PageID.24.) In addition, at a 2016 meeting of the URF Quartermaster Committee, the committee noted that state-issued shoes were "not intended to be used for . . . inclement weather."[1] (10/19/2016 Quartermaster Committee Minutes, ECF No. 1-2, PageID.28.) Moreover, MDOC policy required that prisoners assigned to work "on grounds or maintenance work assignments" be issued "work boots" or "safety boots" "as needed due to the nature of the work[.]" *See* MDOC Policy Directive 04.07.112 ¶ L (effective Oct. 3, 2016).[2] Nevertheless, Hall required Plaintiff to use his state-issued shoes to complete his work assignment on unshoveled walkways.

As part of that assignment, Plaintiff had to deliver a cart filled with buckets of cleaning solution to one of the housing units. After exchanging the full buckets with empty ones, he left the housing unit with the cart and stepped onto one of the snow-covered walkways. He lost his footing in the snow, and then the cart hit him in the calf, causing him to fall backwards. He put his left hand out to protect himself from the impact. When his hand hit the ground, he felt a sharp pain. He removed the glove on his left hand and saw a bone protruding from his fourth finger.

Plaintiff got up and notified the unit officers of his injury. They allowed him to go to the healthcare unit. Staff at the healthcare unit washed his finger and applied gauze, ice, and a

---

[1] According to the meeting minutes, Defendants Forrester and Moran attended the meeting. (*See* ECF No. 1-2, PageID.29.)

[2] The 2016 version of the policy, which was in effect until March 18, 2019, is available at https://web.archive.org/web/20171016064138/http://www.michigan.gov/documents/corrections/04_07_110_PD_536276_7.pdf (visited Mar. 27, 2019).

3

bandage. A physician gave an order to transport Plaintiff to the War Memorial Hospital for further treatment.

At the hospital, Plaintiff received an x-ray of his finger. The x-ray showed a fracture in the "distal phalanx" of Plaintiff's finger. (*Id.*, PageID.10.) Medical staff at the hospital gave Plaintiff antibiotics because the exposure of his bone put him at risk for infection. They also cleaned his finger and placed it in a splint. The physician at the hospital prescribed a course of antibiotics and pain medication, and told Plaintiff to return to the hospital if there was any sign of infection.

When Plaintiff returned to URF, Nurse Stranaly reviewed Plaintiff's hospital discharge papers and informed him that the physician at the hospital had ordered antibiotics and pain medication. Nurse Stranaly told Plaintiff to report to the medication line three times a day.

Plaintiff went to the medication line the following morning and received pain medication but no antibiotics. Plaintiff asked the nurse at the medication line about the antibiotics, but she reported that none had been ordered. Plaintiff indicated that the physician at the hospital had ordered antibiotics. The nurse promised to look into it.

On the following day, February 4, the same thing happened. Plaintiff received his pain medication but no antibiotics. He asked the nurse and she promised to look into it. Sometime later (Plaintiff is not sure of the date), Plaintiff was finally given antibiotics.

From February 2 to February 21, healthcare staff at URF changed Plaintiff's dressings, cleaned his finger with water, dried it, applied Bacitracin (a topical antibiotic), and re-applied his splint. (*See, e.g.*, 2/11/2018 MDOC Bureau of Healthcare Services Soap Note, ECF No. 1-2, PageID.38.)

On February 21, Plaintiff saw Nurse Jennifer Headley (not a defendant), who removed Plaintiff's metal splint and replaced it with a plastic one. She also scheduled Plaintiff for a visit with a doctor to determine a plan for further care. (*See* 2/21/2018 MDOC Bureau of Healthcare Services, Soap Note, ECF No. 1-2, PageID.39.)

According to Plaintiff, on March 19, his finger began to show signs of infection. It was red, swollen, warm, and painful. His allegations are supported by a document prepared by Nurse Bethany Stain (not a defendant), who notes "signs of infection" in Plaintiff's finger, including "increased warmth, increased redness, increased swelling, [and] increased pain[.]" (3/19/2018 MDOC Nurse Protocol, ECF No. 1-2, PageID.40-41.) She consulted with a physician, who prescribed Ibuprofen and Bactrim DS, an oral antibiotic. (*Id.*)

Following that nurse visit, Plaintiff's condition worsened. He developed two "holes" on the sides of his finger that started draining fluid. (Compl., PageID.11.) He sent multiple kites to healthcare services complaining about "severe" pain in his finger. (*Id.*) He was given only over-the-counter (OTC) medication for the pain.

On May 15, 2018, Nurse Practitioner Brenda Buchanan ordered and obtained x-rays showing that the bone in Plaintiff's finger had not healed. She recommended an MRI to determine if there was osteomyelitis (infection of the bone). Plaintiff asked her for pain medication, but she gave him only OTC pain relief, despite his complaint that such medication had not been helpful.

On July 6, 2018, an MRI of Plaintiff's finger confirmed that he had osteomyelitis with "surrounding cellulitis" and a "chronic fracture" of his digital phalanx. (*Id.*) Hill continued to complain about pain in his finger, and medical staff continued to give him ineffective OTC medication, such as Ibuprofen, Tylenol, and Motrin.

On July 10, Defendant Buchanan ordered a consult with an orthopedic specialist, Dr. S. Woolever (not a defendant). Over the next two weeks, Plaintiff sent multiple kites to healthcare services asking for the results of the MRI and complaining that his finger was infected. He asked for antibiotics and more effective pain medication. Apparently, he did not receive a response to his requests.

On July 25, he met with Nurse Payment, who noticed increased signs of infection, including drainage. She allegedly "deferred" a decision on antibiotics at that time,[3] and gave Plaintiff OTC medication for his pain. By August 1, the infection in Plaintiff's finger had worsened. Plaintiff saw Nurse Payment again and she prescribed Cipro, another antibiotic, based on the results of a culture she had taken. (*See* 8/1/2018 MDOC Nurse Protocol & Clinical Progress Note, ECF No. 1-2, PageID.52-53; 8/1/2018 Health Care Services Chart Update, ECF No. 1-2, PageID.54.) She did not prescribe anything for pain.

On August 8, Plaintiff went to the healthcare services unit to complain about the pain in his finger. He saw Nurse Tonya Winberg, who examined his finger and told him that nothing more could be done. She refused to give him anything for his pain other than OTC pain medication. Plaintiff also saw Dr. Woolever, who determined that the infection in Plaintiff's finger had spread to the bone and that Plaintiff would need to consult with a hand surgeon.

Plaintiff continued to complain about pain in his finger. On August 16, he was seen by Nurse Maria Bennett. She prescribed Motrin for his pain. Plaintiff told her that OTC pain medication had not been effective, but she told Plaintiff that he would need to speak with Nurse Buchanan to receive anything stronger.

---

[3] According to Plaintiff's medical records, she obtained an "aerobic culture," ostensibly to determine the nature of the infection. (7/25/2018 MDOC Nurse Protocol, ECF No. 1-2, PageID.50-51.)

Plaintiff went to the healthcare services unit several more times to complain about the pain in his finger, including on August 22 and August 30. On August 22, he was told that he would receive an appointment with Nurse Buchanan, but no such appointment was scheduled. On August 30, Nurse Stranaly told him to wait until he met with the outside hand specialist later that day, and that Plaintiff would be allowed to receive whatever pain medication the hand specialist prescribed. The hand specialist, Dr. Taylor (not a defendant), met with Plaintiff and explained that further treatment with antibiotics would not help. He recommended amputation of the end of Plaintiff's finger. Plaintiff asked Dr. Taylor for medication to assist with pain management, but Taylor stated that Plaintiff would need to ask Nurse Buchanan.

When Plaintiff returned to URF from his appointment with Dr. Taylor, he met with Nurse Waybrant. Plaintiff asked for additional pain medication because the OTC medicine he had received was not effective. Waybrant told Plaintiff to speak with Nurse Buchanan at his next appointment. Waybrant promised to schedule Plaintiff for an appointment with Buchanan, but did not do so.

Plaintiff continued to send requests to healthcare services, ostensibly due to the pain in his finger. He did not receive a reply. He finally saw Nurse Winberg on September 13, 2018. (*See* 9/13/2018 MDOC Bureau of Healthcare Services, Clinical Progress Note, ECF No. 1-2, PageID.69.) He asked for additional pain medication, but she refused to provide anything other than Tylenol and Motrin. She promised to set up an appointment for him to see Nurse Buchanan.

Plaintiff saw Nurse Buchanan on September 17. She explained that her options for pain medication were limited and that she did not think she could get approval for an "off formula" drug. (Compl., PageID.13.) However, she restarted Plaintiff's prescription for Cipro and gave him Naprosyn and a shot of Tarodol.

7

Plaintiff was transferred to the Marquette Branch Prison for surgery on September 26, 2018. That same day, Dr. Taylor amputated the end of Plaintiff's finger.

Plaintiff returned to URF on October 17, 2018. He met with Nurse Guild and told her that his finger was in pain. She told him that he would see Nurse Buchanan "soon." (*Id.*) Over the next several weeks, Plaintiff sent several requests to healthcare services complaining about pain in his finger, as well as "numbness, weakness, swelling, and sens[i]tivity." (*Id.*) He was seen by Nurse Winberg on December 11, 2018. (*See* 12/11/2018 MDOC Nurse Protocol & Clinical Progress Note, ECF No. 1-2, PageID.80-81.) She gave him a hot water bag and OTC medication, even though he complained that those were not effective.

Plaintiff asserts that he was supposed to meet with a "chronic care provider" after his return to URF, but he has not been given an appointment with one. (Compl., PageID.13.)

Based on the foregoing allegations, Plaintiff contends that Defendants violated his rights under the Eighth Amendment.

Plaintiff seeks declaratory and injunctive relief as well as compensatory and punitive damages.

II.   Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough

facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Unsafe Working Conditions

Plaintiff's first set of allegations concerns the conditions that contributed to his injury. He contends that various Defendants were deliberately indifferent to his physical safety and well-being by failure to ensure that the walkways to the housing unit were shoveled and salted, by failing to ensure that Plaintiff had adequate footwear for his work assignment, or by requiring Plaintiff to work on snow-covered walkways while wearing his state-issued shoes rather than work

9

boots. Specifically, Defendant Brian Hall prevented Plaintiff from returning to his cell to retrieve his work boots. Defendant Belanger, who is in charge of the yard crew, failed to ensure that the yard crew shoveled the walkways and then put down sand or salt to create a safe walk surface. In addition, Defendants McKee, Moran, Forrester, and Jon Hall allegedly failed to ensure that prisoners receive shoes that are suited for use in winter weather.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).

"Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

To prevail on an Eighth Amendment claim, Plaintiff must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate

indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). Allegations of negligence fall short of the deliberate indifference required to state an Eighth Amendment claim. *See Farmer*, 511 U.S. at 835 (holding that an Eighth Amendment violation requires a "state of mind more blameworthy than negligence").

The slippery conditions about which Plaintiff complains, and the risk of falling that is associated with them, are not sufficiently serious to give rise to an Eighth Amendment claim. "[F]ederal courts have nearly unanimously held that a 'slip and fall, without more, does not amount to cruel and unusual punishment.'" *Lamb v. Howe*, 677 F. App'x 204, 208 (6th Cir. 2017) (quoting *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004)); *accord White v. Tyszkiewicz*, 27 F. App'x 314, 315 (6th Cir. 2001) (affirming dismissal of prisoner's claim that he slipped and fell on ice because his allegations do not "state a claim under the Eighth Amendment"); *Lotz v. Buck*, No. 4:12-cv-P131, 2013 WL 1742600, at *3 (W.D. Ky. Apr. 23, 2013) (collecting cases); *Chamberlain v. Nielsen*, No. 2:10-CV-10676, 2010 WL 1002666, at *2 (E.D. Mich. Mar. 18, 2010) ("Federal courts have consistently held that slippery prison floors and icy walkways do not give rise to a constitutional violation."); *Nali v. Mich. Dep't. of Corr.*, No. 2:07-cv-255, 2009 WL 3052227, at *6 (W.D. Mich. Sept. 21, 2009) ("[W]hile an icy prison yard walkway presents the possibility for an inmate to slip and fall, it does not pose a substantial or excessive risk of serious harm."). Indeed, it is a "daily risk faced by members of the public at large." *Reynolds*, 370 F.3d at 1031. Consequently, "'[a] slip and fall, without more, does not amount to cruel and unusual punishment. . . . Remedy for this type of injury, if any, must be sought in state court under

traditional state tort law principles.'" *Id.* (quoting *Mitchell v. West Virginia*, 554 F. Supp. 1215, 1217 (N.D. W.Va. 1983)).

In short, Plaintiff fails to state a claim against all of the defendants who are allegedly responsible for his unsafe working conditions, because those conditions are not sufficiently serious to give rise to an Eighth Amendment claim. Accordingly, Plaintiff fails to state a claim against Defendants Brian Hall, Belanger, McKee, Moran, Forrester, and Jon Hall.

### B. Supervisory Liability

Plaintiff sues Defendants Horton, Corrigan, Blemke, Bigger, and Burke because their "subordinates" (Defendants Brian Hall and Belanger) violated Plaintiff's "right" to be free of unsafe working conditions. (*See* Compl., PageID.14.) Plaintiff asserts that Defendants Horton Corrigan, Blemke, Bigger, and Burke should be held liable for the conduct of Defendants Brian Hall and Belanger. Because Plaintiff fails to state a claim against Defendants Brian Hall and Belanger, however, Plaintiff fails to state a claim against Defendants Horton, Corrigan, Blemke, Bigger, and Burke.

Moreover, Defendants Horton, Corrigan Blemke, Bigger, and Burke cannot held liable for the unconstitutional conduct of their subordinates. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an

administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Horton, Corrigan Blemke, Bigger, and Burke engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

### C. Medical Care

Plaintiff's second set of allegations concerns the treatment that he received for his injured finger. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 899 (6th Cir. 2004). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical

treatment," *Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

1. Nurse Stranaly

Plaintiff alleges that after he returned from his first visit to the hospital in February 2018, Defendant Stranaly informed him that the doctor at the hospital had prescribed antibiotics and pain medication. In addition, when he complained about pain in his finger in August 2018, Stranaly told him to speak to the doctor about it that same day, and that the prison would allow Plaintiff to have whatever the doctor prescribed. None of these allegations suggests deliberate indifference to Plaintiff's serious medical needs.

15

In February 2018, Defendant Stranaly merely conveyed information to Plaintiff about the medication that the doctor at the hospital had ordered. Stranaly did not deny him care or prevent him from receiving it. Plaintiff alleges that he did not receive his antibiotics from the nurse at the medication line the following day, but he does not allege that Stranaly was responsible for that situation. Indeed, Plaintiff indicates that he eventually received his antibiotics (on an unknown date) after inquiring with the nurse at the medication line. Even assuming that Stranaly was responsible for ordering his antibiotics and failed to do so, that failure would constitute negligence. It would not rise to the level of deliberate indifference to Plaintiff's medical needs.

Moreover, Stranaly was not deliberately indifferent to Plaintiff's need for pain medication in August 2018 when telling him to speak with the hand specialist about it at an appointment later that day. Stranaly could have reasonably assumed that the specialist would have have the best knowledge about how to treat Plaintiff's pain. Moreover, Stranaly indicated that the prison was willing to provide whatever the doctor prescribed.

Plaintiff's remaining allegations about Defendant Stranaly simply lump Stranaly together with a large group of other defendants. For instance, Plaintiff alleges that Defendant Stranaly, along with Defendants Buchanan, Waybrant, Guild, Payment, Bennett, and Winberg, "knew in July, 2018 that [Plaintiff] contracted Osteomyelitis and that if the condition was not adequately monitored and addressed it could result in serious irreparable harm and even death." (Compl., PageID.16.) Plaintiff also alleges that "Defendants" (including Stranaly) were deliberately indifferent to his need for care for his infected finger. (*Id.*) These latter allegations, which are directed at a group of defendants and do not allege any particular conduct by Defendant Stranaly, are not sufficient to state a claim.

It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries"). Here, Plaintiff's allegations of group responsibility do not provide adequate notice of the specific claims against Stranaly, and do not demonstrate that Stranaly was personally involved in or responsible for violating his Eighth Amendment rights.

For all the foregoing reasons, Plaintiff fails to state a claim against Defendant Stranaly.

2. Remaining Defendants

At this stage of the proceedings, the Court concludes that Plaintiff states a viable Eighth Amendment claim against the remaining defendants, Defendants Buchanan, Waybrant, Guild, Payment, Bennett, and Winberg. These defendants were involved in providing care for Plaintiff's finger, and among other things, they generally refused or failed to provide anything

more than OTC pain medication for his pain, even though Plaintiff repeatedly complained that the OTC medication was ineffective.

### **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Brian Hall, Belanger, McKee, Moran, Forrester, Jon Hall, Horton, Corrigan, Blemke, Bigger, Burke, and Stranaly will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's Eighth Amendment claims against Defendants Buchanan, Waybrant, Guild, Payment, Bennett, and Winberg remain in the case.

An order consistent with this opinion will be entered.

Dated:  April 26, 2019                               /s/ Janet T. Neff
                                                                                         Janet T. Neff
                                                                                         United States District Judge