UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SIDNEY DURELL HILL #724440,    Case No.  2:19-cv-0048

    Plaintiff,    Hon.  Janet T. Neff
                                 U.S. District Judge

v.

BRENDA BUCHANAN, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

### I. Introduction

This Report and Recommendation (R&R) addresses summary judgment motions filed by the two remaining defendants in the case:  Registered Nurse (RN) Hense (nee Guild) (ECF No. 51), and Nurse Practitioner (NP) Buchanan (ECF No. 53).

State prisoner Sidney Durell Hill filed this civil rights action pursuant to 42 U.S.C. § 1983 on February 20, 2019.  (ECF No. 1.)  Hill's verified complaint alleged that he slipped on ice, fell, and broke his finger on February 2, 2018.  (*Id.*, PageId.9.) Hill received treatment from a number of medical providers over the next 10 months. Unfortunately, the fingertip of the broken finger ultimately had to amputated.  That surgery was done in October 2018.  Hill says that RN Hense and NP Buchanan denied him proper medical care, which resulted in continued pain, suffering, and mental distress.  Hill alleges violations of the Eighth Amendment. (ECF No. 1, PageID.16.)

Hill sues Defendants in their official and personal capacities. (*Id.*, PageID.2-3.) He seeks injunctive relief as well as costs, fees and damages. (*Id.*, PageID.17.)

Most of the events in this case took place at the Chippewa Correctional Facility (URF). Hill was transferred to Marquette Branch Prison (MBP) for a brief time for surgery.

I respectfully recommend that the Court grant Defendants' motions for summary judgment.

## II. Summary of Hill's Allegations

Hill's complaint named 18 defendants. This Court's screening opinion dismissed 12 of these defendants. (ECF Nos. 8, 9.) Four additional defendants were dismissed because Hill failed to exhaust his administrative remedies with respect to his claims against these defendants. (ECF No. 38.)

Hill's complaint alleges interactions with numerous members of medical staff at URF. Hill's allegations against Buchanan and Hense are summarized below.

Hill's medical situation began on February 2, 2018, when he slipped on ice, fell, and suffered a fracture of his left ring finger. (ECF No. 1, PageID.10.) Hill says that a protruding bone was visible. Hill's finger was immediately stabilized by workers in the Health Services unit at URF and he was transferred to Chippewa County War Memorial Hospital. (*Id.*) An x-ray of Hill's finger revealed that he has suffered a distal phalanx fracture. (*Id.*) Hill was then started on antibiotics and placed in a splint. (*Id.*) Hill was told to return to the emergency department if there were any signs of an infection. (*Id.*)

Over the next several weeks, Hill reported to the medical unit at URF to have the wound site cleaned and his dressing changed. (*Id.*, PageID.10-11.) Hill says that his finger started showing signs of infection on March 19, 2018. (*Id.*, PageID.11.)

Hill's complaint alleges that he met with NP Buchanan on May 15, 2018. (*Id.*) In response to his complaints, NP Buchanan ordered an x-ray for possible osteomyelitis and a bacterial culture. (*Id.*) She also recommended an MRI. (*Id.*)

Almost two months later, on July 10, 2018, NP Buchanan submitted a request for an orthopedics consultation. (*Id.*)

On August 31, 2018, Hill had a consult with Dr. Nathan S. Taylor. (*Id.*, PageID.12.) According to Hill's medical records, some of which he attached to his complaint, Dr. Taylor recommended amputation of his fingertip. (ECF No. 1-2, PageID.66.)

Hill continued to complain of pain and infection in his finger. He saw NP Buchanan on September 17, 2018. (ECF No. 1, PageID.13.) She told him that she had limited options for pain medications. She restarted Hill on Cipro, which is used to treat infections, and gave Hill a shot of Toradol, which is a pain medication. (*Id.*)

Hill was transferred to Marquette Branch Prison (MBP), and had his fingertip amputated on October 9, 2018. (*Id.*) He returned to URF on October 17, 2018. (*Id.*) RN Hense saw Hill after his return to URF and told him that he would be placed on chronic care due to his finger pain. (*Id.*) Hill says that he was not placed on chronic care. (*Id.*)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV. Eighth Amendment

Hill alleges that RN Hense and NP Buchanan acted with deliberate indifference to his medical needs by failing to prescribe pain medication and delaying treatment, causing the amputation of the fingertip of his left ring finger. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.

*Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* "[A]n inmate who complains that ***delay in medical treatment*** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted). The Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's ***failure to treat a condition adequately***, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added). Thus, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition: A plaintiff making this type of claim must place verifying medical

evidence in the record to show the detrimental effect of the delayed or inadequate treatment.

However, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899.

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official

> has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.
>
> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

### 1. Objective Component

Both Defendants argue that Hill has not provided evidence establishing a genuine issue of material fact regarding the objective component of his deliberate indifference claim. Further, they argue that Hill has failed to place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed. The undersigned respectfully disagrees with this analysis. As noted above, *Napier* and *Blackmore* provide a framework for assessing a claim of delayed or inadequate care for a non-obvious condition: A plaintiff making this type of claim must place verifying medical evidence in the record to show the detrimental effect of the delayed or inadequate treatment. But, the objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore*, 390 F.3d at 899. In this case, Hill's condition deteriorated to the point where a specialist, Dr. Nathan Taylor, recommended amputation (ECF No. 52-2, PageID.346-47) at the distal interphalangeal joint, which is the joint between the fingertip and the middle of the finger[1], to treat the osteomyelitis[2]  that Hill had developed. In the view of the

---

1      *See* https://www.assh.org/handcare/safety/joints (last visited Aug. 3, 2021).
2      "Osteomyelitis is an infection of the bone, a rare but serious condition. Bones can become infected in a number of ways: Infection in one part of the body may spread through the bloodstream into the bone, or an open fracture or surgery may expose the bone to infection." *See* https://www.webmd.com/diabetes/osteomyeltis-

undersigned, the evidence in the record is sufficient to create a genuine issue of fact with respect to the objective component of Hill's deliberate indifference claim.

### 2. Subjective Component

The undersigned, however, concludes that no genuine issue of material fact exists with respect to the subjective component of Hill's claim. As noted above, if "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n.5. Here, the medial records presented establish, beyond dispute, that Hill received extensive post-injury medical care after he broke his finger, including cleaning and bandaging of the wound site, antibiotics, pain medications, referrals for x-rays and an MRI, referral to a specialist and ultimately surgery. This ongoing treatment for just over ten months, including routine check-ups and examinations upon request. (*See* generally, ECF Nos. 52-2, 53-1. 53-1.) Hill's complaint actually provides a chronology of his treatment. (ECF No. 1, PageID.10-14.) Thus, as an initial matter, Hill simply disagrees with the adequacy of his treatment.

The more important point, however, is that Hill has not presented evidence showing that either Defendant acted with a mental state "equivalent to criminal recklessness" or that Defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that [they] did in fact draw the inference, and that

---

treatment-diagnosis-symptoms (last visited August 1, 2021).

[they] then disregarded that risk" by failing to take reasonable measures to abate it. *Rhinehart*, 894 F.3d at 738-39 (citation omitted).

Hill saw RN Hense two times during the ten-month treatment following his injury. The first time was on February 11, 2018, when he appeared for his every-other-day dressing change on his finger. (ECF No. 1-2, PageID.38.) During this visit, Hill did not complain of any pain but said "it kinda throbs all the time." (*Id.*) RN Hense noted a small amount of drainage but no signs of infection. RN Hense had Hill soak his finger for three minutes, then cleaned and dried his finger before applying ointment, a new dressing, and a new splint. (*Id.*) Hill was instructed to continue his scheduled dressing changes and to contact health care if he was in pain or started to see signs of infection. (*Id.*)

The second time RN Hense saw Hill was October 17, 2018, when she performed a health screening after Hill had been transferred back to URF. (ECF No. 53-1, PageID.463-364.) Hill alleges that he informed RN Hense of pain in his finger during this visit. (ECF No. 1, PageID.13.) However, the medical records show no indication that Hill had any complaints. (ECF No. 53-1, PageID.463-464.) RN Hense attests that she does not recall Hill complaining about pain in his finger or asking for more pain medication. (ECF No. 52-3, PageID.350.) RN Hense noted that Hill was already prescribed 34 (500mg) Naproxen pills and 50 (150mg) Ranitidine Hcl pills. Both prescriptions lasted until October 31, 2018. (ECF No. 53-1, PageID.463.) RN Hense cleared Hill to return to general housing at URF. (*Id.*)

Hill offers no medical evidence to show that RN Hense provided inadequate care. The first time Hill saw RN Hense was just for a routine dressing change. By the second time RN Hense saw Hill, his amputation was healing well with no signs of infection. (*Id.*, PageID.460.)

NP Buchanan's affidavit provides a chronology of her involvement with Hill's medication situation, both in terms of personal meetings with Hill and administrative steps she took, such as requesting consults and scheduling appointments. (*See* ECF No. 53-2, PageID.473-75.)

NP Buchanan's first time working on Hill's case was on February 5, 2018, when she reviewed the paperwork from War Memorial Hospital. (ECF No. 53-1, PageID.384.) During this chart review, she realized the ER had "missed" the antibiotics and she ordered Clindamycin for 10 days and 300 Mg Cleocin HCl. (*Id.*)

Hill saw NP Buchanan on May 9, 2018, for a scheduled provider visit. During this visit, Hill complained that his finger continued to drain, was painful, and was infected. (*Id.*, PageID.393.) NP Buchanan noted swelling and redness around Hill's cuticle as well as a small amount of drainage. She proceeded to order a bacteria culture and an x-ray for potential osteomyelitis. (*Id.*, PageID.394.)

Hill alleges he asked NP Buchanan for additional pain medication during this visit. (ECF No. 1, PageID.11.) However, there is no indication in the medical records he asked for additional medication. (ECF No. 53-1, PageID.393.) Additionally, at the time of this visit, Hill had active prescriptions for 90 (400 Mg) Ibuprofen, 120 (325 Mg) Acetaminophen, and 24 (500 Mg) Amoxicillin. (*Id.*)

On May 14, 2018, NP Buchanan rescheduled an x-ray for Hill. (*Id.*, PageID.398.) The x-ray revealed a distal phalanx fracture with some bone erosion. (*Id.*, PageID.399.) The recommendation was to consider osteomyelitis and a biopsy or MRI. (*Id.*) Hill alleges that this x-ray resulted in the first time that osteomyelitis[3] was considered as a cause for his pain. (ECF No. 1, PageID.11.) However, the medical records reveal that NP Buchanan first noted the possibility of osteomyelitis on May 9, 2018, at the time the first x-ray was ordered. (ECF No. 53-1, PageID.393-394.)

Hill saw NP Buchanan again on June 12, 2018, for a chronic care visit. During this visit, Hill complained about continued drainage, but reported he had no fever or chills. (*Id.*, PageID.400.) NP Buchanan noted the bacterial culture from May showed no growth. She also noted significant deformity of Hill's nail and that his fingertip was swollen but that it was not red or hot. (*Id.*, PageID.401.) She ordered a CBC with bacterial culture and explained that Hill would likely need a consultation. (*Id.*, PageID.400.) NP Buchanan submitted a consultation request for an MRI on June 25, 2018, which was approved the same day. (*Id.*, PageID.403.)

NP Buchanan reviewed the MRI results, which showed features compatible with osteomyelitis, then submitted an orthopedics consultation request on July 10, 2018, which was approved the following day. (*Id.*, PageID.407.)

---

[3] "Osteomyelitis is an infection of the bone, a rare but serious condition. Bones can become infected in a number of ways: Infection in one part of the body may spread through the bloodstream into the bone, or an open fracture or surgery may expose the bone to infection." *See* https://www.webmd.com/diabetes/osteomyeltis-treatment-diagnosis-symptoms (last visited August 1, 2021).

NP Buchanan then completed a chart review on August 1, 2018, noting that after she had reviewed positive bacterial culture results from July, she ordered 500 Mg Cipro. (*Id.*, PageID.413.)

NP Buchanan performed another chart review on August 10, 2018, after Hill returned from the orthopedic consultation. It was determined there was possible osteomyelitis and Hill would likely need hand surgery. (*Id.*, PageID.416.) That day, NP Buchanan submitted a consultation request with an orthopedic hand surgeon. (*Id.*, PageID.417-418.) The request was approved on August 13, 2018. (*Id.*) Hill alleges that he requested an appointment with NP Buchanan several times from this date until September. (ECF No. 1, PageID.12-13.) However, there is no record of any of these requests in the medical records. (ECF No. 53-1, PageID.419-434.) The medical record shows that Hill's medical needs were not ignored.

NP Buchanan completed a chart review on August 31, 2018, after the consultation with the hand surgeon. The review indicates that Hill's fingertip would need to be amputated. (*Id.,* PageID.428.) That day, NP Buchanan submitted a request for the amputation of Hill's left ring finger and that request was approved on September 4, 2018. (*Id.*, PageID.429-430.)

Hill saw NP Buchanan for a scheduled provider visit on September 17, 2018. (*Id.*, PageID.435.) Hill complained about pain in his finger and his need to take increasingly more Motrin to tolerate the pain, despite it bothering his stomach. (*Id.*) NP Buchanan noted deformity of his fingertip and nail with a fluid filled area at the

base of the nail. (*Id.*) Hill alleges NP Buchanan refused to seek approval for off formula drugs; The medical records indicate Hill made no request for stronger pain medication. (*Id.*) NP Buchanan ordered 500 Mg Cipro, 150 Mg Zantac, 500 Mg Naprosyn, as well as an intermuscular injection of Toradol. (*Id.*, PageID.436.) Hill was then transferred on September 24, 2018, to Marquette Branch Prison for his amputation and he did not return to URF until October 17, 2018. (*Id.*, PageID.438-463.)

Hill alleges that upon his return to URF, he complained of pain in his finger, and was told he would see NP Buchanan soon. (ECF No. 1, PageID.13.) However, there is no indication in the medical records of any request to see NP Buchanan. (ECF No. 53-1, PageID.463.) Hill alleges that he continued to send requests for Health Services and to see a provider. (ECF No. 1, PageID.13.) Again, there is no evidence in the medical record to support Hill's claims. (ECF No. 53-1, PageID.465-468.)

Hill did not see NP Buchanan again until April 22, 2019, after he complained of pain at the surgical site and that it was cool to the touch. (*Id.*, PageID.469.) NP Buchanan noted the site was healing well and there was no palpable temperature difference. (*Id.*, PageID.470.) She then instructed Hill to perform massage and exercises to retrain the nerves. She also ordered 400 Mg Ibuprofen and 50 Mg Lopressor. (*Id.*)

Hill offers no medical evidence to show that NP Buchanan provided inadequate care. Hill also offers no medical opinion that differs from the treatment he received

from NP Buchanan. (*See* ECF No. 53-3, PageID.477 (deposition transcript).) Each time NP Buchanan saw Hill, she promptly provided him with prescriptions for pain medication, instructions for healing, or submitted consultation requests.

In the opinion of the undersigned, Hill has not provided evidence establishing a genuine issue of material fact regarding the subjective component of his complaint against NP Buchanan. As noted, the medical records reveal that NP Buchanan responded to Hill's medical needs by prescribing medication, reviewing medical records, providing healing instructions, reviewing testing, and submitting consultation requests. (ECF No. 53-1, PageID.376-471.) Although Hill disagrees with the adequacy of the treatment he received, he has not shown that Hense or Buchanan acted with the equivalent of criminal recklessness.

### V. Official Capacity Claims

To the extent that Hill is suing Defendants in their official capacities, such claims are barred by the Eleventh Amendment. The Supreme Court has held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

> A suit against a state official in his or her official capacity for damages cannot be maintained pursuant to § 1983 because that official has Eleventh Amendment immunity. This is true because "a suit against a state official in her or her official capacity is not a suit against the official but rather is a suit against the official's office." As such, a suit against a state official in his or her official capacity is no different than a suit against the state.

*Clark v. Chillicothe Corr. Inst.*, No. 2:19-CV-954, 2020 WL 1227224, at *3 (S.D. Ohio Mar. 13, 2020) (citations omitted).

The Sixth Circuit, in interpreting *Will*, has held "that plaintiffs seeking damages under § 1983 [must] set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply in their capacity as state officials. *Wells v. Brown*, 891 F.2d 591, 592 (6th Cir. 1989). To the extent that Hill seeks money damages from Defendants in their official capacity, that part of his lawsuit is barred by sovereign immunity.

**VI. Recommendation**

It is respectfully recommended that the Court grant RN Hense's motion for summary judgment (ECF No. 51) and NP Buchanan's motion for summary judgment (ECF No. 53).

If the Court accepts this recommendation, this case will be dismissed.

Dated:   August 3, 2021                                        /s/ *Maarten Vermaat*
                                                               MAARTEN VERMAAT
                                                               U.S. MAGISTRATE JUDGE

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).